### THE JOHN A. BRIGGS.

#### BALCH v. 1,261,000 FEET OF LUMBER.

#### (Circuit Court of Appeals, Third Circuit. January 21, 1903.)

#### Nos. 19, 20.

1. SHIPPING—OWNER AND CHARTERER—RESPONSIBILITY FOR SHORTAGE OF CARGO.

Evidence considered, and *held* not to sustain the claim of a charterer for damages because the ship, which was chartered for the voyage for a lump sum, failed to take a cargo of lumber and timber to its full capacity, by reason of improper stowage by the master, but to show that the improper stowage, which was admitted, was due to the failure of the charterer to furnish lumber of the proper dimensions, at the proper times, to enable the master to load properly.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania.

For opinion below, see 113 Fed. 948.

John F. Lewis, for appellant.

Theodore M. Etting, for appellee.

Before ACHESON, DALLAS, and GRAY, Circuit Judges.

ACHESON, Circuit Judge. The first of the above-entitled cases (No. 19, September term, 1902) was a suit in admiralty by the Pacific Pine Company against the ship John A. Briggs for the alleged breach of a charter party by the failure of the vessel to load and carry from two ports on Puget Sound (Port Gamble and Port Blakeley) to Philadelphia a full cargo of lumber. The second of the cases (No. 20, September term, 1902) was a suit in admiralty by the master of the ship against the cargo for demurrage. In the first-mentioned case the district court decreed in favor of the libelant, and awarded it damages in the sum of $4,681.09, and in the latter case dismissed the libel; but in each case the court divided the costs of suit equally between the libelant and respondent.

By the terms of the charter party the whole vessel was chartered by the Pacific Pine Company for the carriage of a cargo of sawn lumber and timber, for the consideration of the lump sum of $23,500. Clause B of the contract provided that the charterer should "furnish to said vessel, at designated loading place or places as herein provided, a full cargo of sawn lumber and timber, of such lengths and sizes as can be taken through vessel's present hatchways or bow or stern ports, if any, and on deck." Clause K provided: "Cargo to be stowed under the captain's supervision and direction, and the stevedore employed by the vessel to be mutually satisfactory to the captain and charterers or their agents."

The libel filed by the charterer avers that before the arrival of the vessel at Port Gamble, in the latter part of December, 1899, over 500,000 feet of the cargo had been cut and was piled upon the wharf, "subdivided into lots of large and small sizes, piled separately"; that the master was notified that certain small sizes thereof were intended for general stowage through the cargo to insure full shipment; that the 500,000 feet of lumber, "all of which was within easy reach of the vessel's tackles, and all of which was of such length and size as could be taken through the vessel's hatchways and bows," was promptly tendered to the master, but the loading was vexatiously delayed for several weeks; that in neglect of his duty to properly load the vessel the master placed a considerable portion of the smaller sizes of lumber, intended to be used for stowage, in the lower hold of the vessel, where other and larger lumber should have been laden, and the vessel, in consequence, was so badly laden as to be unfit to safely carry the full cargo contracted for, the total cargo shipped and carried to Philadelphia being 1,261,000 feet of lumber, which was 190,000 feet less than the vessel could and should have carried had she been properly laden.

The answer of the master of the vessel admits that prior to the arrival of the vessel at Port Gamble a quantity of lumber had been cut and was piled upon the wharf, but denies that "it was subdivided into lots of large and small sizes, piled separately"; admits that the master was notified that certain small sizes thereof were intended for general stowage; denies that the lumber on the wharf, at the time of the arrival of the vessel, was within easy reach of the vessel's tackles, and of such length and size as could be taken through the vessel's hatchways and bows; admits that the pile upon the wharf was tendered to the master, but avers that none of the lumber then accessible was of proper size and character for loading in the lower hold, and that much of it was of too large a size to be taken through the hatchways into the lower hold; avers that the master was requested to cut the beams of the lower hold to admit the taking in of such timbers, but refused to do so; admits that the loading of the cargo was delayed for several weeks, but denies that it was through any fault of the ship, and avers that the delay was altogether because of the failure of the charterer to provide a proper cargo; admits that a considerable portion of the smaller sizes of lumber intended to be used for general stowage was loaded in the lower hold, where other and larger lumber could have been laden, but avers that

the sole reason for this was the failure of the charterer to furnish a sufficient quantity of other proper cargo which could be stowed in the lower hold, and that because of such failure the master finally, much against his will, was compelled to put in the lower hold lumber intended for general stowage; and the answer avers that the "dead freight" spaces and the inability of the vessel to carry certain intended cargo were caused wholly by the failure of the charterer to furnish proper cargo for the lower hold at Port Gamble.

In his opinion the district judge says:

"The testimony is voluminous and conflicting, and will support the theory of either party. It has not been easy to reach a conclusion, but on the whole it seems to me that the weight of the evidence is against the ship. * * * The determining facts are the owners' mistaken direction to the master to load the lower hold first, and the master's mistaken belief that he was not able to take on board the timber that for three weeks was always at his command."

The proofs constrain us to differ from this conclusion. We are convinced that the learned judge overlooked important evidence tending to refute the alleged "determining facts."

Capt. Morse, of San Francisco, a shipmaster of long experience in the carriage of all kinds of cargoes, including lumber, and a disinterested witness, in response to the question, "What part of the ship is it proper to load first?" answers, "The lower hold, always;" and to the question, "What is the effect of not filling the lower hold first?" answers, "It has every effect; not only the safety of the ship, but to properly load the ship. To do justice to the ship, you have to load the lower hold first to get in a proper cargo." This is corroborated by the testimony of other witnesses of great experience called by the respondent, and by the letter of Ames, assistant manager of the Puget Mill, hereinafter quoted. The evidence on the part of the charterer is not materially different. It does not go beyond this: that it is not uncommon to load lumber in the lower between-decks and in the lower hold simultaneously, although it is not the usual practice. Thus, the charterer's witness, Mr. Condon, the superintendent of the Puget Mill, testifies: "The usual manner of loading is to commence at the bottom of a vessel, and load up; but there are a great many·cases where we load— Sometimes in our own vessels we load the hold, between-decks, and the decks at one time. The practice is governed by circumstances." Even upon the charterer's own proofs, the direction to load the lower hold first appears not to have been a mistaken direction. It accorded with the customary and approved method.

The allegation in the charterer's libel that the 500,000 feet of the cargo on the wharf at Port Gamble when the ship arrived was "subdivided into lots of large and small sizes, piled separately," is not sustained by the proofs. The averment indicates that it should have been so subdivided, but the proofs show that it was not. Capt. Balch, the master of the ship, testifies that when the vessel arrived this cargo was "one big pile of lumber. The stowage was a little on the side, separate from that, some lying on the timber. * * * There was not a stick of timber or lumber that I could get at and put in the ship, except stowage, which was piled on a part of the

big timber. * * * There were pieces in the pile that would go in the lower hold if we could get at them, but they were covered up; it was impossible to get to them." This testimony of Capt. Balch is convincingly corroborated. John Soder, the foreman stevedore, testifying to an examination he made with a view of getting ready to load, states: "I looked into the pile, and was figuring on seeing how many timbers there was in it, but it laid in such a way I could not get at it." And being asked "how the timbers were piled as regards their length and dimensions," he answered, "Well, they were all mixed, from the biggest to the smallest, right in the bunch there." The charterer's witness F. C. Talbot, being asked, "Was there any arrangement of the pile made by which different lengths were together, or were the timbers piled up regardless of the question of the lengths of one as compared to the length of its neighbor?" answered, "They were piled up regardless of lengths." Pope & Talbot were agents at San Francisco of the Puget Lumber Company, which furnished the cargo for the ship, and represented the charterer at Port Gamble. Edwin G. Ames was assistant general manager for the Puget Lumber Company at Port Gamble. Now, the letter (in evidence) dated January 5, 1900, written by Pope & Talbot to the Pacific Pine Company (the charterer) at San Francisco, and received by the charterer on January 6th, quotes as follows from a letter of Ames to Pope & Talbot, dated January 2, 1900:

"One difficulty now in loading the ship will be the fact that we have nearly 600M. feet of this cargo piled on the wharf, and it would be a very expensive and dangerous job to try to overhaul this pile of lumber to get out the smaller pieces to stow in the lower hold. * * * In regard to what ought to be done if the charterers are in the wrong, of course you will have to furnish such lumber as the ship can take in the lower hold, and the lower hold will have to be filled before any quantity of lumber is taken in the between-decks. What kind of lumber will sell best in the markets to which the ship is going you are better judges than we are; but it would seem to me as though some changes would have to be made in the order, unless you can compel them to cut a great many beams out to admit of taking long enough timber in the lower hold to admit of proper stowage of the cargo."

There is another important piece of evidence tending to show that the master did not always have at his command proper cargo. After the ship began loading (on January 15, 1900) the Puget Mill, in order to complete the cargo, cut from 135,000 to 150,000 feet of the smaller and shorter sized timbers, which would go into the lower hold.

In this case nothing is clearer than Capt. Balch's earnest and honest opposition to putting the stowage lumber into the lower hold of the ship. How he was eventually induced to do so is plain enough by the proofs. On January 10, 1900, Pope & Talbot telegraphed Ames as follows:

"Ask Balch in off-hand manner why he don't load cargo? If he says he can't put in ship, ask him why he cannot load the small stuff. If he claims that you have denied his right to load it, that it must be kept for stowage, deny same, telling him it was only suggestions on your part; that he is the one to decide how the cargo shall be loaded. Our object is to get some lumber aboard vessel, if only a small amount. If captain finds he can load the

stowage first, we think he will commence taking cargo. Telegraph to us what he does. Do not put anything in writing."

Pope & Talbot, by letter to the charterer, sent on January 11th, and received on January 12th, informed the charterer of the sending of this telegram to Ames, the letter containing a copy of it. Ames carried out the instructions contained in the telegram, as his letter of January 12th to Pope & Talbot shows. On January 12th the shipowners telegraphed from San Francisco to Captain Balch: "Charterers evidently changed tactics. Now claim three hundred and fifty thousand on dock small lumber. Demand it." This telegram was sent after a representation made by W. H. Talbot, a member of the firm of Pope & Talbot and a director of the Pacific Pine Company (the charterer), to one of the owners of the ship that there was at the dock small lumber which the ship could take in. The telegram to Ames and this communication to the shipowners indicate something more than a mere coincidence.

On January 13th, Capt. Balch addressed and delivered to the Puget Lumber Company a letter stating:

"By instructions from San Francisco, I demand any lumber or timber you may have on dock cut for the ship J. A. Briggs that will go in present ports and hatches. The 1x6, 12, 14, 16, and decking 3x6 and 4x6 was intended for broken stowage, which the ship needs for that purpose. It is also for charterer's interest. I do not think it is proper cargo to start lower hold with. I do not feel responsible for proper stowing if charterers do not give proper lumber for that purpose. * * * Will be able to start first thing Monday morning, against my judgment."

Thereupon the Puget Lumber Company "instructed a tallyman to be on hand Monday morning, and to let them have anything they will take." The loading of the small lumber, originally intended for stowage, into the lower hold began on the morning of Monday, January 15th, and was continued from day to day until all was taken in. This was done with the knowledge and consent, and seeming approval, of the Puget Lumber Company, the charterer's agent at Port Gamble.

The charterer's protest of January 18th, addressed to the managing owner of the ship at San Francisco (even if good faith on the part of the charterer can be supposed), was too late. The bulk, if not all, of the small lumber had already been stowed in the lower hold of the ship. As early as January 12th the charterer had been informed of the telegram sent by Pope & Talbot to Ames. If that telegram was to be disavowed, the charterer was bound to act promptly. It could not delay full six days, and then attempt to undo what had been accomplished through Pope & Talbot.

If there was bad stowage, resulting in a shortage of cargo, the charterer is in no position to complain, in view of the circumstances disclosed by the proofs. It follows that the libel in the suit brought by the charterer against the ship should have been dismissed.

The oral argument on behalf of the ship was confined to the main case,—the suit by the charterer against the ship. The appellants' brief does not distinctly point out wherein the court erred in denying demurrage. As the case is presented, it is not clear to us that the court's finding upon the question of demurrage was wrong,

and we will not disturb the decree dismissing the ship's libel against the cargo.

The decree of the district court in No. 19, September term, 1902, the ship John A. Briggs, appellant, against the Pacific Pine Company, appellee, is reversed, with costs in this court to the appellant, and the cause is remanded to the district court, with direction to dismiss the libel, with costs of suit to the respondent.

The decree of the district court in No. 20, September term, 1902, the master of the ship John A. Briggs against the cargo of the ship and claimant, is affirmed, with costs in this court to appellees.